IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JUSTIN DALE CANON,

               Petitioner,

     vs.

KIM HOLLAND,[1] Warden (A), California
Correctional Institution,

            Respondent.

No. 2:11-cv-00524-JKS

MEMORANDUM DECISION

Justin Dale Canon, a state prisoner appearing *pro se*, filed a Petition for a Writ of Habeas

Corpus under 28 U.S.C. § 2254.  Canon is currently in the custody of the California Department

of Corrections and Rehabilitation, incarcerated at the Salinas Valley State Prison.  Respondent

has answered, and Canon has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

A San Joaquin Valley Superior Court jury found Canon guilty of carjacking (Cal. Penal

Code § 215(a)), felon in possession of a firearm (Cal. Penal Code § 12021(a)), street terrorism

(Cal. Penal Code § 186.22(a)), and found that Canon personally used a firearm (Cal. Penal Code

§ 12022.53(b)) and committed the offenses for the benefit of and at the direction of a gang (Cal.

Penal Code § 186.22(b)(1)).  In July 2008 the trial court, after finding that Canon was previously

convicted of a serious felony (Cal. Penal Code §§ 1170.12(b) and 667(d)), sentenced Canon to a

---

[1] Kim Holland, Warden (A), California Correctional Institution, is substituted for
Anthony Hedgpeth, Warden, Salinas Valley State Prison.  Fed. R. Civ. P. 25(d).

prison term of forty-two years and eight months to life.  On August 31, 2009, the California

Court of Appeal, Third Appellate District, affirmed Canon's conviction and sentence in an

unpublished decision,[2] and the California Supreme Court denied review on December 17, 2009.

Canon filed habeas petitions in the San Joaquin County Superior Court on June 13, 2008,

October 31, 2008, and March 6, 2009.  The San Joaquin County Superior Court denied Canon's

June 13 petition in a reasoned decision on July 28, 2008; denied his October 31 petition without

prejudice citing *People v. Duvall*, 886 P.2d 1252 (Cal. 1995), on January 12, 2009; and denied

his March 6 petition citing *In re Bower*, 700 P.2d 1269 (Cal. 1985), *People v. Jackson*, 618 P.2d

149 (Cal. 1980), and *In re Clark*, 855 P.2d 729 (Cal. 1993), on August 10, 2009.  On October 2,

2009, Canon filed a habeas petition in the California Supreme Court, which was summarily

denied without opinion or citation to authority on May 20, 2010.  Canon timely filed his Petition

for relief in this Court on February 22, 2011.

The factual basis for Canon's conviction was summarized by the California Court of

Appeal:

> **The Incident**
> On the evening of August 26, 2006, Romeo Laminero left a coworker's
> birthday party, accompanied by Karengee Pangilinan and Marissa Ruvalcaba and
> driving his black Honda Accord.  When Laminero stopped at a red light, another car
> bumped his Honda from behind.  As Laminero was getting out of his car, he saw
> Eliceo Nunez coming toward him with a gun.  Laminero got back in the Honda and
> drove toward the freeway.
> As they drove away, Laminero, Pangilinan, and Ruvalcaba heard gunshots.
> The Honda was bumped again on the passenger side rear door.  The vehicle hit the
> center median and got stuck.
> [Canon], the driver of the other car, a red Dodge Neon, positioned his vehicle
> to prevent the Honda from moving.  Nunez got out of the Neon and approached
> Laminero with a gun.  Nunez put the gun to Laminero's head and demanded the car.

---

[2] *People v. Canon*, No. C057403, 2009 WL 2737703 (Cal. Ct. App. 2009).

Laminero saw a woman exit the Neon while [Canon] remained in the driver's seat. Laminero hesitated, and Nunez shoved the gun into his stomach and again demanded the car.

Nunez also pointed the gun at Pangilinan and told her to get out of the car. Pangilinan believed she saw a gun in [Canon's] hand, but she "wasn't too sure." She saw something in the driver's hand but was not sure what it was.

After Laminero, Pangilinan, and Ruvalcaba got out of the car, Nunez got in the Accord and drove away. Laminero ran down the street, chasing after his car on foot.

Officer John Black arrived at the scene and interviewed Laminero, Pangilinan, and Ruvalcaba. The officer broadcast descriptions of the suspects and both vehicles.

**The Following Day**

On August 27, 2006, Officer Michael Sabino observed [Canon] driving a red car that matched the description broadcast by Officer Black. Officers attempted to stop the car, but [Canon] drove away, leading them on a high-speed chase.

As he drove, [Canon] threw a TEC-9 firearm, a black backpack, and several bullets from the car. Officers ceased their pursuit when [Canon] almost collided with another vehicle. After officers set up a perimeter, they discovered [Canon] hiding in a trash can.

Officers found the red car had black paint transfer and body damage. A loaded .22-caliber pistol lay on the passenger seat.

**Subsequent Events**

The next day, August 28, 2006, Detective Craig Smith located Laminero's Honda a mile or two from where the incident occurred. The Honda had been stripped of some parts, and officers noticed red paint transfer on the side of the car.

Detective Smith interviewed Laminero 11 days after the carjacking. From photo lineups, Laminero identified [Canon] as the driver of the car and Nunez as the person who aimed a gun at him. Laminero identified the TEC-9 firearm thrown from the red car on August 27 as the weapon Nunez pointed at him during the carjacking.

Nunez's girlfriend, Krystal Ellis, knew both [Canon] and his girlfriend, Wendy Milazzo. Milazzo owned a red car, and the day before the carjacking [Canon] and Nunez drove away in it. The red car [Canon] abandoned was similar to Milazzo's car. Although Ellis could not recall if she had seen [Canon] with a pistol, she had seen Nunez with a .22-caliber pistol. Ellis also knew [Canon] and Nunez were members of the Sureño gang.

In an interview with Detective Smith, Ellis stated that on the night of the carjacking she saw Nunez in a dark-colored car at her apartment complex. Ellis also stated in the interview that she had previously seen [Canon] with the two weapons found at the time of his arrest.

**Prosecution Case**

A jury trial followed. Laminero, Pangilinan, and Ruvalcaba testified regarding the events surrounding the carjacking.

Detective Jim Ridenour testified as an expert on Hispanic gangs. Ridenour, a peace officer for 12 years, had spent five years as a member of the Stockton Police Department's gang unit. He also received training in the area of criminal street gangs. Ridenour personally investigated gang-related incidents, interviewed gang members, and was familiar with gangs and their territories.

Ridenour testified the Sureños are an Hispanic gang with 500 to 600 members locally. There are different subsets of the Sureños, based on geographic location.

Both [Canon] and Nunez had ties to the Bay Area and tattoos of the number 19. Ridenour contacted the San Francisco Police Department and confirmed the existence of the 19th Street Mission District Sureños, a subset of the Sureños.

According to Ridenour, being in a subset of the Sureños did not diminish an individual's status as a Sureño. The primary activities of the Sureños included homicides, attempted homicides, carjackings, burglaries, possession of firearms, vandalism, and drug sales. Ridenour's expertise on the Sureño gang was based, in part, on reading reports and talking to fellow officers.

[Canon] had admitted to being a Sureño during a previous arrest. Finally, Ridenour opined that the carjacking was a gang-related activity.

**Defense Case**

[Canon] testified in his own behalf. [Canon] met Laminero early in August of 2006 and saw him numerous times prior to the incident. Laminero and [Canon] took drugs together, and Laminero instructed [Canon] on how to commit fraud.

[Canon] provided Laminero with a connection to someone who would strip his car so he could collect the insurance. In exchange, Laminero gave [Canon] the two guns recovered when [Canon] was arrested.

At the time of the carjacking, [Canon] was asleep at his girlfriend's house. When he awoke the day after the carjacking, [Canon] went out to steal mail with his girlfriend. The two quarreled and she left.

 [Canon] fled from police in the red car because he was in possession of firearms and on parole. [Canon] had the weapons because he was in an area claimed by the Norteño gang and he needed protection. He knew nothing of the carjacking and pled guilty right away to a charge of possession of a firearm by a convicted felon.

On cross-examination, [Canon] admitted he and Nunez were members of San Francisco's 19th Street Sureños. [Canon] testified he was not a Sureño when outside of San Francisco. He disputed the gang expert's description of some of his tattoos as gang tattoos.

[Canon] testified that during his incarceration he was attacked by another inmate in the holding cell and was forced to defend himself. According to [Canon], Nunez was not there. [Canon] wrote "SF 19" on the wall in the other inmate's blood because the other inmate "got blood on [him]."

Codefendant Nunez also testified. He admitted being a member of the 19th Street Sureños and had been for 15 years. He and [Canon] became members of the

4

gang as children in San Francisco.  Nunez denied participating in the carjacking.  He testified he and [Canon] were involved in an assault on a Norteño inmate in the holding cell because Norteños were a rival gang.[3]

## II.  GROUNDS RAISED/DEFENSES

Canon raises eight grounds in his Petition:  (1) the trial court erred in admitting evidence of Canon's possession of a firearm; (2) the evidence was insufficient to support the conviction for carjacking; (3) the evidence was insufficient to support the conviction for street terrorism; (4) the denial of his constitutional right of confrontation; (5) the trail court failed to *sua sponte* instruct the jury on the street terrorism charge; (6) a *Doyle* violation;[4] (7) cumulative error; and (8) the denial of effective assistance of counsel.  Respondent contends that Canon's eighth ground is unexhausted and procedurally barred.  Respondent asserts no other affirmative defenses.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in

---

[3] *Canon*, 2009 WL 2737703 at *1-3.

[4] *Doyle v. Ohio*, 426 U.S. 610 (1976).  A short-hand reference to the prosecution's use of a defendant's post-arrest silence after the defendant invokes his rights under *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966), to impeach the defendant's trial testimony.

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[9]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial

---

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15]  State appellate court decisions that summarily affirm a lower court's opinion without

---

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[15] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

explanation are presumed to have adopted the reasoning of the lower court.[16]  This Court gives

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[17]

Under California's unique habeas procedure, a prisoner who is denied habeas relief in the

superior court files a new original petition for relief in the court of appeal.  If denied relief by the

court of appeal, the defendant has the option of either filing a new original petition for habeas

relief or a petition for review of the court of appeal's denial in the California Supreme Court.[18]

This is considered as the functional equivalent of the appeal process.[19]  Under AEDPA, the state

court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

by clear and convincing evidence.[20]  This presumption applies to state-trial courts and appellate

courts alike.[21]

---

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[18] *See Carey v. Saffold*, 536 U.S. 214, 221-22 (2002) (citations omitted) (discussing California's "original writ" system).

[19] *See id.* at 222 ("Thus, typically a prisoner will seek habeas review in a lower court and later seek appellate review in a higher court . . . .").

[20] 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." (citing 28 U.S.C. § 2254(e)(1))).

[21] *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) ("Stevenson does not address these factual findings, let alone challenge them with clear and convincing evidence. Accordingly, we presume them to be correct." (citing 28 U.S.C. § 2254(e)(1); *Pollard v. Galaza*,

## IV.  DISCUSSION

Ground 1:  Admission of Evidence of Firearm Possession

The trial court admitted evidence that Canon possessed a firearm at the time of his arrest on the day following the day of the carjacking.  Canon argues that the prosecution improperly used this evidence as inadmissible character evidence and to prove the felon in possession of a firearm and use of a firearm enhancements.  The California Court of Appeal rejected Canon's arguments, holding:

> **Evidence of Incident on the Following Day**
>
> [Canon] argues the trial court erred in admitting the firearm evidence stemming from the incident on August 27, the police chase the day after the carjacking.  According to [Canon], Evidence Code section 1101 bars the admission of this evidence because it constituted improper character or disposition evidence.  In addition, [Canon] contends the trial court failed to perform the balancing test required under Evidence Code section 352.
>
> *Background*
>
> As noted, [Canon] was charged with possession of a firearm by a convicted felon (§ 12021, subd. (a)), and it was alleged that [Canon] personally used a firearm (§ 12022.53, subd. (b)).
>
> The prosecution sought to introduce and the defense moved to exclude evidence of the TEC-9 firearm that [Canon] threw from the car during the high-speed chase on August 27; the car was later found abandoned with a .22-caliber Ruger revolver in the front passenger seat.  Discovery of the Ruger led [Canon] to plead guilty to possession of a firearm by a convicted felon, and he was serving a term for that offense at the time of trial.
>
> The prosecution offered various theories of admissibility.  While conceding that whether the gun [Canon] possessed in the car when arrested on August 27 was the gun used in the carjacking remained in dispute, the prosecution insisted that evidence regarding the gun was relevant to prove [Canon] "did in fact have a weapon on this night, that would . . . indicate and negate the theory and the argument . . . that he doesn't carry firearms and he wouldn't have one."  As to evidence of the discarded TEC-9, the prosecution argued the gun could be linked to the TEC-9 used in the carjacking.  The prosecutor reasoned that it "[i]t goes to show his possession at some time and the consistency of that weapon, the same weapon that was used during the

290 F.3d 1030, 1035 (9th Cir. 2002))).

carjacking . . . that's the relevance of it and, obviously, it's good evidence, that's why it's prejudicial."

The prosecution also argued "[t]he high speed chase and the pursuit goes to consciousness of guilt." And in closing argument, the prosecution stated: "We are focusing on the night of the 26th of August of 2006. We know that Defendant Canon had weapons in his possession from the evidence, likely the same exact weapons that were used during the course of that carjacking the night before. But he's not charged with the possession on the 27th. He's charged with using it and possessing it the night of the 26th, during the course of the carjacking."

Defense counsel objected, insisting the evidence had no probative value with regard to the current charges and citing the potential prejudicial effect of the evidence confusing the jury and possibly leading to the jury's inability to separate the two incidents. Defense counsel noted [Canon] had already been convicted for throwing the gun out the window on August 27. Defense counsel argued that the jury might confuse the gun possession at arrest with the gun possession on the night of the carjacking, even though there was no evidence the same gun was used in both incidents. Further, defense counsel argued that [Canon] could be convicted in the carjacking case with the evidence from the August 27 incident and his subsequent arrest and guilty plea. According to defense counsel, if the August 27 firearm possession was part of the same course of conduct as the carjacking, then the prosecution of the carjacking count would be barred.

The court instructed the jury that certain evidence was admitted for a limited purpose, and that they "may consider that evidence only for that purpose and for no other." In addition, the court instructed the jury that [Canon's] charge of unlawfully possessing a firearm referred only to the August 26, 2006, incident.

*Discussion*

Evidence of a person's character, in the form of specific instances of his or her conduct, is inadmissible to prove the person's conduct on a specific occasion. (Evid.Code, § 1101, subd. (a).) However, evidence that a person committed a crime or some other act is admissible if relevant to prove some fact, such as motive or intent, other than his or her disposition to commit such an act. (Evid.Code, § 1101, subd. (b).)

The admissibility of evidence of uncharged offenses or other acts depends on the materiality of the facts to be proved, the tendency of the uncharged conduct to prove the material fact, and any policy against admission of relevant evidence. To satisfy the materiality requirement, the fact sought to be proved by the uncharged conduct may be either an ultimate fact or an intermediate fact from which such ultimate fact may be inferred. To make this determination, the trial court must ascertain whether the evidence of uncharged conduct logically, naturally, and by reasonable inference establishes that fact. (*People v. Thompson* (1980) 27 Cal.3d 303, 315 & fn. 14.)

In addition, evidence of uncharged offenses is admissible only if it has substantial probative value. The probative value of the uncharged offense must be weighed against the danger of undue prejudice, confusion of issues, or misleading the

jury.  (*People v.. Ewoldt* (1994) 7 Cal.4th 380, 404; Evid.Code, § 352.)  We review the trial court's admission of evidence under Evidence Code sections 1101 and 352 for an abuse of discretion.  (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123; *People v. Kipp* (1998) 18 Cal.4th 349, 369, 371.)

[Canon] argues the only relevance of his gun possession on August 27 was as character evidence to prove his gun possession and use on August 26.  This view distorts the import of the evidence.  The fact that [Canon] possessed guns might reflect poorly on his character, but that aspersion pales in significance to the fact that the guns he possessed matched the description of guns used in the carjacking.  This fact, together with the circumstances of his apprehension, links him to the August 26 carjacking.  During the August 27 incident, [Canon] possessed a gun of the same model as that used in the carjacking, which, when combined with the high-speed chase that ensued, proved consciousness of guilt of the earlier offense.

[Canon] argues the admission of the firearm evidence was unduly prejudicial, because the jury found [Canon] guilty of personal gun use and possession on August 26 when the only evidence presented was that Pangilinan saw "something" in the driver's hand. According to [Canon], "[a]part from the evidence of gun possession on August 27, this scant testimony is all that was submitted to support the gun use enhancement and the possession offense."  We disagree.

In her testimony, Pangilinan stated she was not sure whether [Canon] had a gun in his hand during the carjacking.  However, Pangilinan previously told Detective Smith that she had seen [Canon] with a gun.  Ruvalcaba testified she saw a gun in [Canon's] hand but stated [Canon] approached the car and stood by Pangilinan's window.  This eyewitness testimony, separate and distinct from the firearm evidence from August 27, supported the jury's finding of gun possession during the carjacking.

The prosecution, in closing argument, emphasized that the possession of a firearm on August 27 could not be the basis for the possession charges alleged against [Canon].  The trial court also instructed the jury that the charge of unlawful possession of a firearm referred only to the August 26 incident.  The trial court did not err in admitting the firearm evidence.[22]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[23]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental

---

[22] *Canon*, 2009 WL 2737703 at *4-6.

[23] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

11

conceptions of justice."[24]  "[T]he Due Process Clause does not permit the federal courts to

engage in a finely tuned review of the wisdom of state evidentiary rules."[25]  In criminal actions,

"[t]he States are free to provide such procedures as they choose, including rules of evidence,

provided that none of them infringes a guarantee in the Federal Constitution."[26]  The Supreme

Court has made clear that federal habeas power does not allow granting relief on the basis of a

belief that the state trial court incorrectly interpreted the state evidence code in ruling on the

admissibility of evidence.[27]  In this context, the Supreme Court has defined the category of

infractions that violate fundamental fairness very narrowly, limiting them to specific guarantees

enumerated in the bill of rights.[28]  For example, the Supreme Court has barred the introduction of

evidence in state court criminal proceedings that violated the Fourth Amendment (search and

---

[24] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[25] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983)).

[26] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

[27] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[28] *McGuire*, 502 U.S. at 73 (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

seizure),[29] Fifth Amendment (confessions),[30] Sixth Amendment (Confrontation Clause),[31] and (right to counsel).[32]

On the other hand, in deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the lower federal courts.[33] "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[34]

Federal Rule of Evidence 404, as does its counterpart, California Evidence Code § 1101, generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge.[35]   No preliminary showing is necessary before such evidence may be

---

[29] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[30] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[31] *Crawford v. Washington*, 541 U.S. 36 (2004); *Pointer v. Texas*, 380 U.S. 400 (1965) (transcript of preliminary hearing without assistance of counsel to confront and cross-examine absent witness inadmissible).

[32] *Burgett*, 389 U.S. at 114-15 (evidence of prior conviction obtained in violation of Sixth Amendment right to counsel inadmissible).

[33] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006).

[34] *Id.* (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

[35] This Court notes that, "[t]o the extent the Supreme Court has addressed the issue, it has expressly reserved consideration of whether the admission of prior bad acts under state law to show propensity constitutes a due process violation."  *Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006) (citing *Estelle v. McGuire*, 502 U.S. 62, 75 n.5 (1991)).

introduced for a proper purpose.[36]  If offered for such a proper purpose, the evidence is subject

only to general strictures limiting admissibility such as Rules 402 and 403.[37]

There is a split among the circuit courts as to the proper standard of review, de novo or

abuse of discretion, to be applied to the question of whether evidence falls within the scope of

Rule 404(b).  The Ninth Circuit applies a de novo standard,[38] while the Second Circuit applies an

abuse of discretion standard.[39]  California employs an abuse of discretion standard on appellate

review of § 1101(b) rulings.[40]  The Supreme Court has held that in ruling on whether evidence is

properly admitted under Rule 404(b) the court must consider whether:  (1) the prior acts evidence

was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the

probative value of the prior act evidence substantially outweighed the danger of its unfair

prejudice; and (4) the court, if requested, administered an appropriate limiting instruction.[41]

Under California Evidence Code § 1102(b), as "circumstantial evidence, its admissibility

---

[36] *Huddleston v. United States*, 485 U.S. 681, 687-88 (1988).

[37] *Id.* at 688; *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (noting that once it has been established that the evidence at issue serves an admissible purpose, such as establishing motive or intent, the only conditions justifying the exclusion of the evidence are those set forth in Rule 403); Fed. R. Evid. 402 ("Relevant Evidence generally Admissible; Irrelevant Evidence Inadmissible."); Fed. R. Evid. 403 ("Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time.").

[38] *See United States v. Montgomery*, 384 F.3d 1050, 1061 (9th Cir. 2004).

[39] *United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006).

[40] *People v. Daniels*, 802 P.2d 906, 924 (Cal. 1991); *see People v. Kipp*, 956 P.2d 1169, 1181 (Cal. 1998) (admissibility ruling under section 1101(b) is essentially a determination of relevance that is reviewed for abuse of discretion).  Given the split between the circuits and the fact that the Supreme Court has not expressly ruled on this question, it cannot be said that the use of an abuse of discretion standard is an unreasonable application of federal law as established by the Supreme Court.  *Kessee*, 574 F.3d at 679.

[41] *Huddleston*, 485 U.S. at 691-92.

14

depends upon three principal factors: (1) the materiality of the fact sought to be proved or

disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3)

the existence of any rule or policy requiring the exclusion of relevant evidence."[42]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352,

permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide

discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the

probative value of [the proffered evidence], and weighing any factors counseling against

admissibility is a matter first for the district court's sound judgment under Rules 401 and

403 . . . ."[43]  California employs a similar rule.[44]

Although the Ninth Circuit has suggested that an abuse of discretion may also amount to

a constitutional violation,[45] the Supreme Court has never held that abuse of discretion is an

appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme

Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct

review, in a federal habeas proceeding it is not.[46]

---

[42] *People v. Thompson*, 611 P.2d 883, 888 (Cal. 1980) (citations omitted).

[43] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).

[44] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("[W]e review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

[45] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc).

[46] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (citing § 2254(d)(1))).

In this case, the trial court also gave a limiting instruction on the proper use of the evidence.  This Court assumes that the jury followed the limiting instructions it was given.[47]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[48]  Because Canon has failed to establish a question of constitutional dimension, he is not entitled to relief under his first ground.

Ground 2:  Insufficient Evidence (Carjacking); Ground 3:  Insufficient Evidence (Terrorism)

Canon argues that there was insufficient evidence to support his conviction of either carjacking for the benefit of gang (Ground 2) or to support the finding that there was a pattern of criminal conduct by the Sureños gang to which Canon belonged (Ground 3).  The California Court of Appeal rejected Canon's argument:

> **Sufficiency of the Evidence: Carjacking for Benefit of a Gang**
>
> [Canon] contends the prosecution failed to prove that he committed the carjacking for the benefit of, and with the specific intent to promote, a criminal street gang.  According to [Canon], the evidence produced by the prosecution was so vague, conclusory, and insubstantial that it is insufficient to support the gang enhancement.   Under the prosecution's approach, [Canon] argues, every act committed by a person with visible gang tattoos must be deemed to benefit a gang.
> *Background*
> During trial, Detective Ridenour testified as an expert on Hispanic gangs.  Ridenour described the Sureño gang, its territory, and its mode of operation.   The prosecution described the circumstances surrounding the carjacking and asked Ridenour for his opinion as to whether the carjacking was gang related.  Ridenour answered, "Yes."
> Ridenour testified he had contacted the San Francisco Police Department to request information about [Canon's] tattoos and was told that two of them, the number 19 and the word "mission," signified membership in the 19th Street Mission

---

[47] *Abney v. United States*, 431 U.S. 651, 664 (1977).

[48] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted); *see Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam).

Sureños.  [Canon] also sported a tattoo of "SFM," standing for San Francisco Mission District; two tattooed "SF" marks; and a landscape of a San Francisco bridge.

In addition, Ridenour testified the number 13 is claimed by the Sureños. [Canon] had several number 13 tattoos, as well as tattoos that translated into 13.

According to Ridenour, "gangs commit carjackings or steal cars for the purpose of to use that car to commit crimes.  Therefore, if somebody gets a plate or description of the car, it won't come back to them, it will come back to that victim." Gang members use guns, Ridenour testified, to intimidate victims, to let victims know that Sureños are violent.  Ridenour stated: "They have guns and they can basically boss those people around and take their property with them whenever they want by fear or by force.  [¶] . . .  [¶] . . . whenever a gang member does a violent crime for that gang, it beefs up that gang."  These activities strike fear in the community, fear of violence and crime.

[Canon] testified he belonged to the San Francisco 19th Street Mission Sureño gang.  His tattoos referred to his gang.  Nunez was a fellow gang member.

*Discussion*

In order to establish a gang enhancement, the prosecution must prove the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  In addition, the prosecution must prove the gang (1) is an ongoing association of three or more persons with a common name, or identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated by the statute; and (3) includes members who either individually or collectively have engaged in a pattern of criminal activity by committing two or more of the enumerated offenses during the statutorily defined period.  (§ 186.22, subds.(e) and (f); *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617 (*Gardeley* ).)

These requirements may be met via expert testimony explaining gang psychology and customs.  (*People v. Valdez* (1997) 58 Cal. App. 4th 494, 507-509; *Gardeley, supra,* 14 Cal.4th at p. 617.)  A gang expert may render an opinion in response to a hypothetical question as to gang-related activity, so long as the hypothetical is rooted in the facts shown by the evidence. (*People v. Gonzalez* (2005) 126 Cal. App. 4th 1539, 1551, fn. 4.)

In reviewing a challenge to the sufficiency of the evidence in support of a gang enhancement, we examine the evidence to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. Substantial evidence is evidence that is reasonable, credible, and of solid value. (*People v. Augborne* (2002) 104 Cal. App. 4th 362, 371; *People v.. Johnson* (1980) 26 Cal.3d 557, 576.)

[Canon] argues Ridenour's evidence was "lacking sufficient substantial and credible value."  According to [Canon], "Detective Ridenour's testimony was, for the most part, vague speculation about the general habits of gang members.  None of the crimes described by the detective were shown to have actually benefitted the gang to

which [[Canon]] belonged, the 19th Street/Mission District gang, or even the Sure[ñ]o umbrella organization."

Ridenour testified that a carjacking as described in a hypothetical question, based on the facts of this case, would benefit the Sureño gang. [Canon] and Nunez, Ridenour stated, were active Sureño gang members and committed the carjacking "to use that car to commit crimes" by making the gang members less traceable. The carjacked car would enable the Sureños to move from one crime scene to another. Ridenour provided substantial evidence, not merely vague speculation as [Canon] asserts.

[Canon] also argues the gang enhancement applies only if the charged offense was committed with the specific intent to assist other criminal conduct by gang members. However, the element of intent is generally proven through circumstantial evidence. Specific intent to benefit the gang is not required. Instead, the prosecution must show defendant possessed the specific intent to promote, further, or assist in any criminal conduct by gang members. (*People v. Morales* (2003) 112 Cal. App. 4th 1176, 1198.)

Here, the evidence revealed [Canon] participated in the carjacking of Laminero's car. Ridenour testified such carjackings inure to the benefit of the criminal gang by providing a difficult-to-trace vehicle the gang can use in future crimes. The jury had before it sufficient evidence to find the crime was committed for the benefit of the gang.

**Sufficiency of the Evidence of Primary Activities or Pattern of Conduct**

[Canon] also challenges the sufficiency of the evidence to prove the primary activities of the 19th Street Mission District gang or even of the Sureños in general, or to prove a pattern of criminal conduct by the Sureños that was actually known by [Canon]. [Canon] faults Ridenour for merely listing the primary activities for a gang without any specific supporting evidence for that bare opinion, a practice that would render "just about any crime being deemed a gang-related crime."

*Background*

Ridenour testified the Sureño gang came to San Joaquin County in 1991 and has 500 to 600 members in the City of Stockton. Members of Sureño subsets are considered full members of the Sureño gang.

The Sureños' primary crimes, Ridenour testified, consist of homicides, attempted homicides, carjackings, burglaries, possession of firearms, vandalism, and drug sales. Ridenour also testified Sureños engaged in a pattern of criminal gang activity.

[Canon] testified he had been convicted of grand theft, participating in a criminal street gang, assault with a deadly weapon, vehicle theft, illegal possession of a firearm, and stalking.

*Discussion*

To establish a gang enhancement under section 186.22, the prosecution must establish one of the group's primary activities is the commission of one or more specified crimes and the group's members have engaged in a pattern of criminal

activity. A pattern of criminal activity is defined as two or more enumerated offenses committed on separate occasions or by two or more persons. (§ 186.2, subd. (e).)

Multiple incidents of criminal activity are not necessary to prove a pattern. A pattern can also be proven by showing that multiple gang members participated in a single incident of criminal activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 5.)

To establish primary activities under section 186.22, the trier of fact may look to both the past and present criminal activities of the gang. Isolated criminal conduct will not suffice. Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. The primary activities element may be established through expert testimony. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323; *In re Alexander L.* (2007) 149 Cal. App. 4th 605, 611 (*Alexander L.*).)

In reviewing the sufficiency of the evidence in support of the gang enhancement, we determine whether there is credible, reasonable evidence from which a rational trier of fact could find the essential elements of the charge or allegation true beyond a reasonable doubt. (*People v. Vy* (2004) 122 Cal. App. 4th 1209, 1224.)

*Primary Activities*

[Canon] argues the prosecution did not prove any primary activities with regard to the San Francisco 19th Street Mission District gang, but only submitted proof relating generally to activities of local Sureños with no indication [Canon] had any connection with them or knowledge of their crimes. This generalized proof, [Canon] contends, denied him his due process right to be held liable for his own actions, not the actions of others he has never met or of whom he has no knowledge. Ridenour provided his professional law enforcement experience with gangs. He had investigated a vast number of gang-related crimes, interviewed numerous gang members, and had arrested several hundred gang members. In addition, Ridenour had academic training in gangs. As for the Sureños, Ridenour was familiar with the gang through his assignment as an intelligence officer for Hispanic gangs. His duties included investigating and obtaining intelligence on all Hispanic gang crimes in Stockton. Ridenour identified gang members and investigated gang-related crimes.

At trial the prosecutor asked: "[I]s one of the gang's primary activities the commission of any of the . . . criminal acts listed in Penal Code Section 186.22, sub (b)?" Ridenour responded yes, and listed "homicides, attempted homicides, carjackings, burglaries, possession of firearms, vandalism, and dope sales." Ridenour also testified that, as a result of the gang's activities, victims would be reluctant to cooperate with law enforcement, suggesting the gang's crimes were consistent and not an occasional aberration. Ridenour's background and expertise provided a backdrop for his testimony as to the Sureños' primary activities. (*Gardeley, supra,* 14 Cal.4th at p. 620 [testimony by police expert provided a basis from which a jury could reasonably find the primary activities element was met].)

Such was not the case in *Alexander L., supra,* 149 Cal. App. 4th 605, relied upon by [Canon]. In *Alexander L.,* the defendant was charged with vandalism stemming from his "tagging," or spray painting graffiti. (*Id.* at p. 609.) An expert

testified graffiti generally benefited [*sic*] a gang.  The expert stated he knew the gang had " 'committed quite a few assaults with a deadly weapon, several assaults.  I know they've been involved in murders.  [¶]  I know they've been involved with auto thefts, auto/ vehicle burglaries, felony graffiti, narcotic violations.'"  (*Id.* at p. 611.)  The expert did not testify that the criminal activities comprised the gang's primary activities, nor did he provide details or any information as to how he acquired the information.  (*Id.* at pp. 611-612.)  The court found the testimony lacked sufficient foundation.  (*Id.* at p. 612.)

Ridenour's testimony suffers no such infirmity.  He testified as to his background in investigating the Sureños and gave his opinion as to their primary activities.  The testimony was sufficient to establish the element of primary activities.

*Pattern of Criminal Activity*

[Canon] also disputes the sufficiency of the evidence in support of a finding of a pattern of criminal activity.  Again, [Canon] challenges the sufficiency of Ridenour's testimony regarding the activities of the Sureños.  Ridenour testified about incidents involving Nunez and two other Sureño gang members.  One Sureño, Manuel Soto, had been convicted of assault with a deadly weapon.  The other, Eric Zapata, had been convicted of murder and voluntary manslaughter.  Nunez had been convicted of attempted murder, robbery, and illegal possession of a weapon, and was a documented Sureño gang member.  Nunez testified he and [Canon] had been gang members together since they were "kids."  [Canon] testified he had been convicted of grand theft with a gang enhancement in 1998, assault with a deadly weapon in 2001, and vehicle theft in 2006.  This evidence established the requisite pattern of criminal gang activity required by section 186.22.[49]

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[50]  This Court must, therefore, determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence,

---

[49] *Canon*, 2009 WL 2737703 at *6-10.

[50] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard).

made the inferences, or considered the evidence at trial.[51]  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."[52]

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[53]  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.[54]  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.[55]  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[56]  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[57]  This is especially

---

[51] *Jackson*, 443 U.S. at 318-19.

[52] *Id.* at 326; *see McDaniel*, 130 S. Ct. at 673-74.

[53] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[54] *Jackson*, 443 U.S. at 324 n. 16.

[55] *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

[56] *Bradshaw v. Richey,* 546 U.S. 74, 76, (2005); *see West v. AT&T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

[57] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

true where the highest court in the state has denied review of the lower court's decision.[58]

"[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[59]  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."[60]  It is through this lens that this Court must view a sufficiency of the evidence claim.

Canon misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  This Court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.[61]  In this case, the California Court of Appeal determined that there was sufficient evidence of each element of the crimes as defined in California law to support Canon's conviction.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.[62]  Canon bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous;[63] a burden Canon has

---

[58] *Id.*; *see West,* 311 U.S. at 237 ("This is the more so where, as in this case, the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court."); *Shannon v. Newland*, 410 F.3d 1083, 1087 (9th Cir. 2005) (same).

[59] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[60] *Sanchez-Llamas*, 548 U.S. at 345.

[61] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[62] *See Jackson*, 443 U.S. at 326.

[63] 28 U.S.C. § 2254(e)(1).

failed to carry.  The record does not compel the conclusion that no rational trier of fact could have found proof of guilt, especially considering the double deference owed under *Jackson* and AEDPA.  Accordingly, this Court cannot find that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the California Court of Appeal rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[64]

Ground 4:  Denial of Right to Confrontation

During the testimony of Ridenour, the trial court allowed into evidence the criminal records ("rap sheets") of Soto and Zapata, two members of the Sureños gang.  Canon argues that this violated his Sixth Amendment right of confrontation under *Crawford*.  The California Court of Appeal rejected Canon's argument:

**Admission of Rap Sheets**

Defendant argues the trial court erred in admitting the rap sheets of Sureños Zapata and Soto.  According to defendant, the admission of the rap sheets denied him his right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford* ).

*Background*

During Detective Ridenour's testimony, the prosecution introduced certified copies of Zapata's and Soto's criminal rap sheets.  Based on the rap sheets, Ridenour testified as to the duo's criminal convictions.  Defense counsel objected, arguing they were unreliable hearsay and a violation of defendant's constitutional rights.  The trial court overruled the objection.

*Discussion*

In *Crawford, supra,* 541 U.S. 36, the United States Supreme Court held that the Sixth Amendment's confrontation clause bars admission of testimonial statements of witnesses absent from trial.  An exception exists only if the prosecution establishes that the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness.  (*Crawford,* at p. 59.)

---

[64] 28 U.S.C. § 2254(d).

Defendant acknowledges the court in *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*) concluded that *Crawford* does not apply to the admission of hearsay statements used in support of expert testimony.  The *Thomas* court determined such statements were not offered to establish the truth of the matter asserted, but merely to serve as a basis for the expert witness's opinion.  (*Id.* at p. 1210.)  However, defendant argues *Thomas* should be reevaluated.

In *Thomas,* the court held that the confrontation clause did not apply to prevent admission of hearsay evidence in the form of a gang expert's conversations with other gang members in which they identified the defendant as a gang member.  The conversations were mentioned only as a basis for the gang expert's opinion that the defendant was a gang member.  According to the court, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion."  (*Thomas, supra,* 130 Cal. App. 4th at 1210.)

We find *Thomas* persuasive and see no need to revisit the issue. The trial court did not err in admitting the rap sheets of Zapata and Soto.[65]

Canon's argument is foreclosed by the recent decision of the Supreme Court in *Williams v. Illinois*, in which the Court held that evidence that is introduced to provide the facts upon which an expert bases his or her opinion, but not to prove the truth of the underlying facts, does not implicate the Confrontation Clause.[66]  Canon is not entitled to relief under his fourth ground.

Ground 5:  Failure to Correctly Instruct on Street Terrorism Charge

Canon contends that it was error for the trial court not to *sua sponte* instruct the jury that his mere presence at the scene of the crime was insufficient to constitute active participation in a street gang.  The California Court of Appeal rejected this argument:

---

[65] *Canon*, 2009 WL 2737703 at *10-11.

[66] *Williams v. Illinois*, 132 S. Ct. 2221, 2232-40 (2012).

**Instructional Error**

[Canon] argues the trial court failed to instruct sua sponte that [Canon's] mere presence at the scene did not make him an aider and abettor of any crime. In addition, [Canon] contends, the court improperly instructed the jury to decide whether [Canon] himself committed the crimes comprising the primary activities of the gang. According to [Canon], these errors deprived [Canon] of a defense and confused the jury.

*Background*

The trial court instructed the jury on the elements of active participation in a street gang: "To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant actively participated in a criminal street gang; [¶] 2. When the defendant participated in the gang, he knew that members of the gang engage in or have engaged in a pattern of criminal street activity; [¶] and [¶] 3. The defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang." (CALCRIM No. 1400.)

The court also provided a definition of "pattern of criminal gang activity: "1. The commission of or conviction of any combination of two or more of the following crimes: Murder, Voluntary Manslaughter or Assault with Force Likely to Cause Great Bodily Injury. These offenses are defined elsewhere in these instructions. [¶] 2. At least one of these crimes was committed after September 26, 1988; [¶] 3. The most recent crime occurred within three years of one of the earlier crimes; [¶] and [¶] 4. The crimes were committed on separate occasions, or were personally committed by two or more persons. [¶] The People need not prove that every perpetrator involved in the pattern of criminal gang activity, if any, was a member of the alleged criminal street gang at the time when such activity was taking place. [¶] . . . [¶] To decide whether the defendant committed attempted murder, shooting at an occupied motor vehicle, mayhem or felon in possession of a firearm, please refer to the separate instructions that I will give you on those crimes." (CALCRIM No. 1400.) The jury instructions included instructions on possession of a firearm by a convicted felon, the crime [Canon] was accused of.

*Discussion*

Trial courts have a sua sponte duty to instruct on the general principles of law relevant to the case. This obligation includes instructions on all the elements of a charged offense, on recognized defenses, and on the relationship of these defenses to the elements of the charged offense. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 333-334.) We review claims of instructional error de novo. (*People v. Russell* (2006) 144 Cal. App. 4th 1415, 1424.)

The notes to CALCRIM No. 1400 state: "If there is evidence that the defendant was merely present at the scene or only had knowledge that a crime was being committed, the court has a **sua sponte** duty to give the [following instruction: If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of

25

a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]"  [Canon] faults the trial court for not giving this instruction.

According to [Canon], the eyewitness testimony established that [Canon] was the driver of the red Neon "and did not do much, if anything."  We disagree.

Although [Canon] reads the evidence selectively, the eyewitness testimony revealed [Canon] was an active participant in the carjacking.  [Canon] drove the car that bumped Laminero's car, forcing it to stop.  After Laminero attempted to flee, [Canon] again bumped the car, once more forcing it to stop.  [Canon] then positioned the red Neon to prevent Laminero's driving away.  During the carjacking, Pangilinan thought she saw a gun in [Canon's] hands.  Ruvalcaba stated [Canon] walked up to the Accord and pointed a gun at them.  None of this evidence supports the giving of a mere presence instruction.

Moreover, [Canon] claimed to not have been present at the scene.  He testified he was sleeping at Milazzo's apartment.  A trial court has a duty to instruct sua sponte on particular defenses relied upon or supported by substantial evidence and that are not inconsistent with the defendant's theory of the case.  (*People v. Barton* (1995) 12 Cal.4th 186, 195.)  Here, the instruction on mere presence clashes with [Canon's] insistence that he was not even present during the carjacking.[67]

While it is true that due process and the Sixth Amendment to the Constitution require that a jury be correctly instructed as to every element of the crime with which a defendant is charged and convicted,[68] that is not the issue before this Court.  The instruction that Canon contends should have been given does not go to an element of the crime, but is a supplemental instruction given only if the evidence supports it.  The Supreme Court has also held that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."[69]  In a collateral attack on a state conviction, the question is whether the instructional error so infected the verdict that the

[67] *Canon*, 2009 WL 2737703 at *11-12.

[68] *See United States v. Gaudin*, 515 U.S. 506, 522-23 (1995).

[69] *Mattews v. United States*, 485 U.S. 58, 63 (1988).

resulting conviction violates due process.[70]  The Ninth Circuit applies this rule to habeas petitions arising from state convictions.[71]  In this case, Canon's burden is especially heavy because the instruction given was not erroneous; his claim is based upon the failure to give an explanation beyond the reading of the basic instruction itself.  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of law."[70]

In this case, there was no evidence that Canon was "merely present" at the scene of the crime.  Other than his own testimony, what evidence there was concerning Canon's involvement in the crime indicated more than a "mere presence," and his own testimony was that he was not even present.  Under the facts of this case, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the California Court of Appeal rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[71]  Canon is not entitled to relief under his fifth ground.

Ground 6:  *Doyle* Violation

During his testimony, the prosecution's gang expert (Ridenour) twice referred to the fact that he had been unable to question Canon concerning his tattoos.  Canon contends that, because

---

[70] *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[71] *Bradley v. Duncan*, 315 F.3d 1091, 1098 (9th Cir. 2002).

[70] *Kibbe*, 431 U.S. at 155.

[71] 28 U.S.C. § 2254(d).

this infringed upon his constitutionally protected right to remain silent under *Miranda*, it violated

*Doyle*.  The California Court of Appeal disagreed, holding:

> ### *Doyle* Error
>
> Finally, [Canon] contends the gang expert committed reversible error when he twice testified he had not been able to speak with [Canon] about the meaning of [Canon's] tattoos.  Since [Canon] had invoked his right under *Miranda* not to speak with the police, the expert's testimony was a reference to that invocation in violation of *Doyle, supra,* 426 U.S. 610.
>
> Detective Ridenour testified regarding [Canon's] tattoos.  The prosecution asked:  "And what, if any, significance does that have?  [¶]  A.  He has a 13 on his middle and index finger-or middle and ring finger, and a S-R, which I'm not quite sure what that stands for.  I haven't been able to talk to Mr. Canon to find out what that means.  [¶]  Q.  Okay.  Does the S and/or the R have any significance separately?  [¶]  A.  Well, it could.  I just don't—I have never been able to officially talk to Mr. Canon and ask him any questions."
>
> Defense counsel objected and moved for a mistrial, arguing [Canon] had invoked his *Miranda* rights and refused to speak with officers.  Ridenour, defense counsel asserted, was referring to the fact that [Canon] hadn't spoken with Ridenour or other officers, so references to his exercise of his right to silence was error.
>
> The trial court denied the motion for a mistrial.  The court explained: "I'll tell you, it is a concern to me, because I think . . . it's close.  Because it does allude to a Miranda situation.  [¶]  But I thought about it and I'm going to deny it for two reasons.  [¶]  First of all, I think the language was a bit ambiguous in that, 'I didn't get a chance,' or, 'I wasn't able to,' I think is a little different than 'He would not speak, he refused to speak,' something along those lines that would make it a clear Miranda situation versus an accessibility, it may just be a physical accessibility, something like that.  [¶]  Second of all, and I think this is the most important point to me, was the fact that this was regarding a tattoo.  If it was regarding the case, I think I would grant the motion, to be honest with you.  If this was regarding his involvement in the case, I think I would grant a mistrial.  [¶]  But because it was limited to the issue of a tattoo, and a tattoo that was not deemed to even be gang-related, I think for that reason, if there is any error, it's harmless."
>
> *Discussion*
>
> Under *Doyle,* the United States Supreme Court held a defendant cannot be penalized for invoking his *Miranda* rights.  *Doyle* prohibits the prosecution from impeaching a defendant's trial testimony with evidence of the defendant's silence after being arrested and advised of his constitutional right to silence under *Miranda.* (*Doyle, supra,* 426 U.S. 610; *People v. Earp* (1999) 20 Cal.4th 826, 856.)
>
> A violation under *Doyle* has two components.  The first is that the prosecution uses a defendant's postarrest silence for impeachment purposes.  The second is that the trial court permits that use, giving the jury the unmistakable impression that what the prosecution is doing is legitimate.  Both elements are

necessary.  (*Greer v. Miller* (1987) 483 U.S. 756, 763-764 [97 L.Ed.2d 618].)  There is no *Doyle* error if there is no attempt to suggest a defendant's invocation of his right to remain silent was substantive evidence of guilt or to impeach a defense by referring to a defendant's postarrest silence.  (*People v. Austin* (1994) 23 Cal. App.4th 1596, 1612-1613.)

[Canon] argues that although Ridenour did not directly tell the jury [Canon] had invoked his *Miranda* rights, Ridenour's testimony was an "indirect but clear reference to [[Canon's]] silence."  We disagree.

Ridenour's statements came within the context of interpreting one of [Canon's] tattoos.  In responding to the prosecution's questions, Ridenour simply stated he hadn't been able to talk to [Canon] about the tattoo.  When asked about the significance of the "S" and "R" tattoo, Ridenour responded that he hadn't been able to officially talk to [Canon].

Neither response hinted at or alluded to [Canon's] invocation of his right to silence.  In addition, Ridenour's testimony centered on the meaning of [Canon's] gang tattoos, not on any of the circumstances surrounding the carjacking.

Despite [Canon's] attempts to portray the tattoo interpretation as "central to the gang expert's opinion," Ridenour's testimony was only minimally related to the case.  [Canon] himself testified as to his gang membership.  As previously discussed, Ridenour relied on his expertise and experience in investigating Sureño crimes in forming his opinion regarding the gang benefit enhancement.  Ridenour did not reference the tattoos in forming his opinion.  Nor did the prosecution refer to [Canon's] tattoos in closing argument when discussing the gang enhancement.

Given the brief, ambiguous reference to Ridenour's inability to ask [Canon] about his tattoos and the tangential connection between the tattoos and the crimes [Canon] was convicted of, we find the trial court did not err in finding the comments did not constitute *Doyle* error.[72]

In *Doyle*, the Supreme Court held that a criminal defendant's reliance on his right to

remain silent under *Miranda* may not be used against him in any way at trial, including for

impeachment.[73]  A *Doyle* error, however, does not entitle a petitioner to habeas relief unless it

"'had [a] substantial and injurious effect or influence in determining the jury's verdict.'"[74]  In this

---

[72] *Canon*, 2009 WL 2737703 at *12-14.

[73] *Doyle*, 426 U.S. at 618.

[74] *Brecht*, 507 U.S. at 622 (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)); *cf. Greer v. Miller*, 483 U.S. 756, 768-69 (Stevens, J., concurring) (explaining the different standard applied to a *Doyle* error on direct review to that applied on habeas review).

case, even if the testimony could be construed as violating *Doyle*, this Court cannot find that an ambiguous response to a question that was not intended to draw the jury's attention to Canon's post-arrest silence had a substantial and injurious effect on the jury's verdict.  Therefore, this Court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the California Court of Appeal rendered its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[75]  Canon is not entitled to relief under his sixth ground.

Ground 7:  Cumulative Error

The California Court of Appeal rejected Canon's argument that the trial court's errors, taken together, were sufficiently prejudicial to require reversal.

**Cumulative Error**

[Canon] asserts that, taken together, the trial court's errors were sufficiently prejudicial to require reversal.  Since we find any error on the part of the trial court in instructing under CALCRIM No. 1400 was not prejudicial, we find no cumulative error.[76]

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."[77]  This Court has considered and rejected the

---

[75] 28 U.S.C. § 2254(d).

[76] *Canon*, 2009 WL 2737703 at *14.

[77] *Peyton v. Cullen,* 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi,* 410 U.S. 284, 298, 302-03 (1973)).

errors Canon seeks to cumulate; to the extent there was any error, his trial was not rendered fundamentally unfair.[78]  Canon is not entitled to relief under his seventh ground.

Ground 8:  Ineffective Assistance of Trial Counsel[79]

Canon contends that he was denied the effective assistance of trial counsel in four particulars:  (1) a failure to advise him that he was exposed to a sentence of life in prison; (2) failure to investigate the fact that his girlfriend's vehicle, allegedly used in the crime, had been substantially damaged in a hit-and-run accident months preceding the crime; (3) failure to call James Banks, Ralph Soriano, and Rosie Bautista as witnesses; and (4) that counsel has a conflict of interest.  Respondent contends that this claim is unexhausted and procedurally barred. Because these defenses, if sustained, would preclude review on the merits, this Court will address them first.

*Failure to Exhaust*

Respondent contends that this claim is unexhausted because the California Supreme Court has not had an opportunity to review it.  Respondent's contention is internally inconsistent with the acknowledgment that the claims were presented to the California Supreme Court in Canon's habeas petition.[80]  Canon presented his ineffective assistance claims in his October 31,

---

[78] *Id.*

[79] Canon also makes a general cruel and unusual punishment claim, but he does not, however, provide any factual basis or legal argument in support of that claim.  Consequently, the Court declines to address it.

[80] Canon also raised these same ineffective assistance claims before the San Joaquin County Superior Court in a Motion for a New Trial filed on October 16, 2007, and in an Amended Motion for a New Trial filed October 31, 2007.  Lodged Doc. 15, Vol III, at 668-83. The Superior Court held an evidentiary hearing and denied the motion on October 5, 2007. Lodged Doc. 15, Vol. III at 706; Lodged Doc. 17, Vol. V at 1376-1426.  Canon did not include an ineffective assistance of counsel claim on direct appeal.  Respondent does not address the

2008, and March 6, 2009, petitions for habeas relief in the San Joaquin County Superior Court.

This Court's review of the habeas petition presented to the California Supreme Court shows that

Canon did, in fact, present his ineffective assistance of counsel claims to the California Supreme

Court in federal terms.  Thus, this Court rejects Respondent's failure to exhaust defense.

*Procedural Bar*

In rejecting Canon's October 2008 petition, the San Joaquin Superior Court did so

without prejudice, stating it was "absent any affidavits or documentary evidence supporting the

claims," citing *People v. Duvall*, 886 P.2d 1252 (Cal. 1995).[81]  In rejecting Canon's subsequent

March 2009 petition, the San Joaquin County Superior Court held:

> **REASON:**  This petition adds nothing to the previous petition filed in
> October 2008 and denied by this court.  The petition is therefore denied as an abuse
> of the writ process.  [*In re Bower* (1985) 38 Cal.3d 865; [*sic*] 215 Cal.  Rptr. [2d]
> 267, 700 P.2d 1269; *People v. Jackson* (1980) 28 Cal.3d 264; [*Sic*] 168 Cal. Rptr.
> [2d] 603, 618 P.2d 149; *In re Clark* (1993) 5 Cal.4th 750; [*sic*] 21 Cal.  Rptr. 2d 509;
> [*sic*] 955 P.2d 7209.][82]

 The California Supreme Court summarily denied Canon habeas relief without opinion or citation

to authority.

Federal courts "will not review a question of federal law decided by a state court if the

decision of that court rests on a state law ground that is independent of the federal question and

adequate to support the judgment."[83]  This Court may not reach the merits of procedurally

---

effect of this;  therefore, this Court will assume that Respondent does not assert that this
omission has any bearing on his claim that the claim is unexhausted.

[81] Lodged Doc. 8.

[82] Lodged Doc. 10.

[83] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

defaulted claims, that is, claims "in which the petitioner failed to follow applicable state

procedural rules in raising the claims . . . ."[84]  Under California law, "delayed and repetitious

presentation of claims is an abuse of the writ."[85]

> "It is the policy of this court to deny an application for habeas corpus which
> is based upon grounds urged in a prior petition which has been denied, where there
> is shown no change in the facts or the law substantially affecting the rights of the
> petitioner.  [Citations.]  And as to the presentation of new grounds based on matters
> known to the petitioner at the time of previous attacks upon the judgment, in *In re
> Drew* (1922) 188 Cal. 717, 722 [207 P. 249], it was pointed out that the applicant for
> habeas corpus 'not only had his day in court to attack the validity of this judgment,
> but ... had several such days, on each of which he could have urged this objection, but
> did not do so'; it was held that 'The petitioner cannot be allowed to present his
> reasons against the validity of the judgment against him piecemeal by successive
> proceedings for the same general purpose.'"[86]

Procedural default does not preclude federal habeas review unless the last state court

rendering judgment in a case, clearly and expressly states that its judgment rests on a state

procedural bar.[87]  In this case, despite the lack of a pinpoint citation, the San Joaquin County

Superior Court clearly relied on the "abuse of the writ" doctrine.  Although the ultimate burden

of proving adequacy of a state procedural bar is on the Respondent, once Respondent has

"adequately pled the existence of an independent and adequate state procedural ground as an

affirmative defense, the burden to place that defense in issue shifts to the petitioner."[88]  The

petitioner may satisfy his burden "by asserting specific factual allegations that demonstrate the

---

[84] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

[85] *Clark*, 855 P.2d at 741.

[86] *Id.* (quoting *In re Horowitz*, 203 P.2d 513, 521 (Cal. 1949)).

[87] *Teague v. Lane*, 489 U.S. 288, 298-99 (1989) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989)).

[88] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."[89]  Although in his Traverse Canon addresses the procedural default defense raised, he does not contend that the state procedure is either inadequate or that the rule is inconsistently applied.  Thus, Canon's eighth ground is procedurally barred.

*Merits*

Even if this Court were to reach the merits, Canon would not prevail.  After holding an evidentiary hearing on Canon's motion for a new trial, the San Joaquin County Superior Court rejected Canon's arguments in the only reasoned decision rendered by a state court.

> First is the matter of the deal.  There never was an offer in this Court. It's usually my practice to talk to the attorneys when I get assigned a jury trial to figure out kind of what's going on and whether there is something that can be worked out without a jury. And [the prosecutor] was very adamant that there was no deal and it was going to trial.
>
> The discussions that we had about determinate sentencing, The Court was a part of that. [Defense counsel] was here, [co-defendant's counsel] was here, and [the prosecutor] was here, because it was kind of, like, what is this case, what is it worth, and so forth.  And usually sometimes I like to, you know, talk about exposure and stuff in terms of working something out, but because [the prosecutor] was so adamant that there were no offers, we frankly did not go through that.  And frankly, I did not know and we did not discuss exposure and so forth in this case until it came to verdicts and so forth.  So even though there is some initial discussion of numbers, it certainly never went beyond a preliminary stage.
>
> To say that [defense counsel] could have asked for something or that something else could have been worked out, I think is speculative.  And I think in this situation, it's speculative at best.  It wasn't made, and at no time do I ever recall any context [Petitioner] indicating that he wanted any kind of resolution of this case short of a trial.  So I don't think that that issue is persuasive.
>
> On the issues of the witnesses, I'm gonna lump Jackie Bautista and Rosie Bautista together.  It's obvious that attempts were made to interview them and it's obvious that they were either unable to be contacted or avoided service in those cases.  [Defense counsel] cannot come and ask me to issue a bench warrant for their arrest when they haven't been served.

---

[89] *Id.*

And it's obvious from the testimony of Mr. Williams that they were avoiding service in this case for whatever reason.  It may have been at least as to one of them, even if she had been served, I would have anticipated a Fifth Amendment assertion once she got to the stand and appointment of attorney.  And I don't think we would have ever heard any testimony about that.

While Rosie Bautista's alleged corroborating testimony of [Petitioner] certainly would have had some relevancy, first of all, I think it's speculation that that's what they would testify to.  It's one thing to have some person call an investigator, identify themselves as some person and say something.  But if they're not willing to come into court and say it under oath on the stand, The Court cannot give a lot of weight to that, and she was not willing to do so.  So I don't put a lot of weight in that. I think those are both speculative.

On the issues of Mr. Soriano and Mr. Banks, this was a situation where these gentleman were in contact with the victim vehicle on the day after - - I don't recall if it is the day after, but at some time period after the car-jacking in this case. So you have two scenarios.  You're either going to call them to say, "I didn't get the car from Mr. Cannon," [*sic*] or you're going to call them to say, "I'm the one that did the carjacking."

Well, again we're to that situation where, first of all, they're not going to say, "I did the car-jacking," because that would have Fifth Amendment consequences to it.  So that kind of testimony would have never come forward. And to say, "I didn't get it from Mr. Cannon" might have some relevancy, but it doesn't mean that - - it doesn't absolve Mr. Cannon from responsibility in the car-jacking.  So I don't see that as terribly persuasive, the testimony of somebody that may have had possession of the vehicle sometime after the car-jacking.

And on the conflict, given [defense counsel]'s testimony - - and I will put this on the record - - she did disclose this to The Court, because we did have this discussion - - and I don't know if it was in chambers or in open court, but we did have this discussion about the possible conflict.  And one that was very clear was that [the prosecutor] was not going to call Mr. Banks and [defense counsel] indicated she did not intend to call Mr. Banks.  Then at that point, it was not felt that there was a conflict.

And it raises the issue of if Mr. Cannon did not feel that [defense counsel] did a good job for him - - and as contentious as this relationship was at times, [defense counsel] in my opinion vigorously - - vigorously defended Mr. Cannon in this trial. She was here every morning prepared.  She had her cross-examination prepared.  She had her closing argument prepared.  It would have been very easy for her to come in and go, "Oh, I have a conflict," because of personal issues that they had, especially at the beginning.  I mean, I think I did two or three Marsdens myself, and I know there was at least one in front of Judge Garber if I'm not mistaken.  It would have been easy for her to say, "I have a conflict. I'm gonna get out of it."  But she stuck it out and did her best to defend [Canon] and, in fact, beat several counts in the information in trial.  So I don't see any basis for any sort of incompetency of counsel in terms of effort.

The shots near the red Neon in October, that's the first I heard about it. This offense happened in August and, again - - and then, I'll also put that also with the alleged accident. Again, without dates, there's no way to order reports of those. And again, whatever evidentiary value those would have I think are negligible given the evidence The Court heard in the trial.

. . . .

And then finally, on the issue of The Court sitting as a 13th juror, The Court did do that. Obviously, in every trial I sat and listened to the evidence of the witnesses and the testimony. Frankly, I think Mr. Cannon's testimony hurt him most of all, to be honest. I thought that [defense counsel] did a very good job of cross-examining the eye witnesses and raising some issues to the best of her ability, but frankly, I think Mr. Cannon was one of the People's best witnesses. So for all the forgoing reasons, I will deny all the new trial issues.

And let me - - I didn't say this succinctly, but this is what I intended: The standard for incompetency of counsel is that deficiency that is so below the standard for attorneys, which I don't think were [sic] even near, and then again, the issue of prejudice, which I think The Court addressed with the 13th juror comments. So new trial motions are denied.[90]

Canon does not challenge the denial of his motion for a new trial in this Court, nor did he challenge it on either direct appeal or in his state court habeas petitions. Even if he had, Canon would not prevail. Under *Strickland*, to demonstrate ineffective assistance of counsel, Canon must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[91] A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."[92] Canon must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[93] An ineffective assistance of

---

[90] Lodged Doc. 17, Vol. V at 140-26 (omitted materials address other, unrelated issues).

[91] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[92] *Id*.

[93] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[94]

> In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[95]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[96]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard.  Rather, the focus is on whether the state-court decision holding that counsel was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different from an *incorrect* application of federal law."[97]

Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it

---

[94] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[95] *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009).

[96] *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

[97] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (emphasis in the original).

must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.[98]

While judicial inquiry into counsel's performance under *Strickland* must be highly deferential, it is "by no means insurmountable," but nonetheless remains "highly demanding."[99] "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."[100] "Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial."[101]  Canon has failed to overcome the strong presumption that counsel's performance fell within the wide range of reasonable professional assistance or that his defense was prejudiced by any alleged omission as required by *Strickland-Hill*.

This Court cannot say that the decision of the San Joaquin County Superior Court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[102] Nor, viewing the matter through the doubly-deferential lens of *Mirzayance-Richter*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of Canon's case within the scope of *Andrade-Williams-Landrigan-Richter*; i.e., the state court decision was not more than incorrect or erroneous, its application of clearly established federal law was not objectively unreasonable.  Canon has failed to establish that counsel committed any

---

[98] *Id.* at 786.

[99] *Morrison*, 477 U.S. at 382.

[100] *Richter*, 131 S.Ct. at 791 (internal quotation marks and citation omitted).

[101] *Morrison*, 477 U.S. at 382.

[102] 28 U.S.C. § 2254(d).

error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that defendant's defense was prejudiced, as required by *Strickland-Hill*.  Canon is not entitled to relief under his eighth ground.

## V.  CONCLUSION AND ORDER

Canon is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[103]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[104]

The Clerk of the Court is to enter judgment accordingly.

Dated: October 3, 2012.

<u>    /s/ James K. Singleton, Jr.          </u>
JAMES K. SINGLETON, JR.
United States District Judge

---

[103] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

[104] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.